PIERCE *v.* JONES.

4-7314                                       179 S. W. 2d 454

Opinion delivered April 17, 1944.

*Hugh Williamson* and *Ben B. Williamson,* for appellant.

*Pickens & Pickens,* for appellee.

GRIFFIN SMITH, Chief Justice. The right to close a road through lands within township fourteen north, range two west, in Jackson County, is involved.

L. D. Pierce owns 1,300 acres, parts of which (at various points) adjoin some of the 1,200 acres owned by Jones.

The south half of section seventeen and the north half of section twenty, each traversed by Black River, are among the Jones holdings. The south half of section twenty belongs to Pierce.

Access to an old northeast-southwest dirt road along the river meandering through Jones' property in sections seventeen and twenty was unobstructed prior to 1915. During 1915 Jones, who had just acquired the property, placed a gate at a point on his own land just north of where the road crosses the east-west median line dividing section twenty. Various transactions relative

to this gate, and Jones' action in closing it and in closing a second gate across the same road south of Black River in section sixteen east of the north-south boundaries between sections sixteen and seventeen, are more particularly shown in the footnote.[1]

---

[1] In addition to other lands, Jones owns the south half of sections sixteen and seventeen; the north half of section twenty; all of sections twenty-one and twenty-eight, and what appears from a diagram not drawn to scale to be the northeast quarter and the northwest quarter of the southeast quarter of section twenty-nine.

Included in lands owned by Pierce are the south half of section twenty; .the west half of section twenty-nine, and 36 acres in the east half of the southeast quarter and the southwest quarter of the southeast quarter of section twenty-nine.

Pierce Island is in the north half of section sixteen and is touched on the west by Black River which traverses section seventeen diagonally from northeast to the southwest extremities.

The Pierce home is on the. east side of his holdings .in section twenty-nine. The south of sections twenty-eight and twenty-nine are touched by a gravel road to which Pierce has access, and westward at a point seemingly slightly past the center of the west half of section twenty-nine, this road turns due north, touching a point on the south side of section twenty. It then turns west and extends into section nineteen where Pierce also owns lands, but the area in nineteen is not involved in this controversy.

Approximately 1,200 acres of Black-River lowlands are a grazing range, 500 being in sections seventeen and twenty. Those parts of the 500-acre area in the south half of section seventeen and the north half of section twenty east of Black River are affected by the appeal.

During 1915 Jones built an east-west fence on the south side of his land in section twenty, erecting a gate at the southwest corner. At that time the 1,200 acres of river bottom lands were used as a pasture. In 1943 Jones divided this ,into 500- and 700-acre tracts, the purpose being to separate pure-bred and range-run cattle. A fence paralleling the boundaries between the north half of sections twenty and twenty-one and the south half of sections sixteen and seventeen joined the east-west fence which divided the Jones and Pierce lands in section twenty. This fence extended northward to the river. Beginning near the southwest corner of the Pierce land in section twenty a dirt road meanders northward across the west end, then crosses the Jones land where the gate was erected in 1915. This road continues to skirt the southeast bank of Black River and intersects the north-south fence erected by Jones in 1943.

Pierce owns an island in the north half of section sixteen and used the gravel road and dirt continuation. His holdings in sections sixteen, nineteen, and twenty aggregate 1,300 acres. In addition, Pierce owns the Lockhart Ferry on Black River (section nineteen). The gate erected by Jones in 1915 was destroyed by overflow a few years later, but was rebuilt in 1929 by Pierce. In 1938 or 1939 it was rebuilt by Jones. When the new east-west fence which bisected section twenty was built in 1943, Jones decided to eliminate the gate. .This had the effect of blocking Pierce and others who desired to travel the so-called river road. A second gate near the northwest corner of the south half of section sixteen had been maintained. It was also closed.

When Jones closed the road, Pierce asked for an injunction, claiming prescriptive rights. The object was to obtain a mandatory order to compel Jones to provide gates where the two had formerly been maintained.

The Chancellor declined to issue an order requiring Jones to restore the gates. Pierce has appealed.

There is little doubt that the road, with seasonal variations due to obstructions caused by high water, had been used generally for many years before Jones bought in section twenty. There is testimony that as early as 1892 a defined trail skirted the river, and that no affirmative objections were made by proprietors. It is also in evidence that the land was wild, its value in that state consisting of timber, and vegetation (grass, nuts, mast, roots, etc.) suitable for grazing.

If Pierce has right of access, it was acquired by prescription because he, with others of the public, used the way adversely for seven years. The case is controlled by intention coupled with conduct. If public use had been such as to justify reasonable minds in thinking the purpose was to disregard proprietary interests, or if acquiescence by owners became tantamount to dedication, the right to withdraw use would not be lost by acts of those in title who erected gates. An explanation on behalf of appellant is that partial obstruction was designed to enclose cattle in one area or exclude them from another, and had no reference to travel.

Prescription attaches where an owner has knowingly permitted the public to use the road for a period of seven years under a claim of right. The converse is that such right does not mature if travel has been by leave or through mistake. *McCracken* v. *State,* 146 Ark. 300, 227 S. W. 8, 228 S. W. 739. Where the public used a road through "open and unfenced lands," there having been no action of the County Court creating it, and there was no official attempt to work it or to exercise authority over it as a public highway, a presumption arose that use of the way was not adverse to the owner and that his consent would be implied. *Brumley* v. *State,* 83 Ark. 236, 103 S. W. 615; *Merritt Mercantile Company* v. *Nelms,* 168 Ark. 46, 269 S. W. 563.

So, here, (wild land being affected) it must be presumed that owner-consent had been expressly or im-

pliedly given prior to 1915 and that those accommodated by this privilege had no intention of challenging ownership. Such ownership—or, rather, the insignia of intent —was asserted when Jones erected a gate. If the public's act of travel (presisted in for seven years or more) had not, prior to 1915, ripened into prescription, erection of the gate was an act of ownership. It was Jones' notice to the public that he claimed a right to·do the thing no one then appears to have..complained of. That he and Pierce were in accord respecting the reason for building the gate is not controlling. The point is that conduct of the public—not the action or understanding of an individual—is the criterion.

The pronouncement in *Porter* v. *Huff*, 162 Ark. 52, 257 S. W. 393, was that the public, by acquiescing in the maintenance of a ·gate in circumstances somewhat similar to those disclosed by the record in this appeal, lost any right it may have acquired through prescription. A statement in the opinion is :·''When appellee enclosed his land and placed gates across the .road, it was notice to the public that·thereafter they were passing through the land by permission, and not by right.''

In *Mount* v. *Dillon*, 200 Ark. 153, 138 S. W. 2d 59, it was held that ''If the right was acquired by prescription, and abandoned as the Court found, the Court could not give appellee nor the public the right to travel it by prescription.''

It is not necessary in the instant case to say that a prescriptive right once acquired by the public could be destroyed by acts of Jones, the landowner. Our holding is predicated upon the presumption that use of the wild land had been permissive—a presumption strengthened by failure of persons adversely interested to protest when private proprietary rights were, *prima facie,* exercised twenty-eight years ago and continued with but slight interruption until 1943.

Appellant points to the fact that Jones did not procure a County Court order permitting erection of the gates. Distinction ·between Act 74 of 1895 and Act 385

of 1937 is emphasized. The former afforded a method whereby landowners in overflow areas might, through petition to the County Court, procure a judgment authorizing construction of gates across "any public highway." The 1937 enactment uses the words, ". . . across any road traversing such [overflow] lands." It is urged that since the last Act substituted "any road" for "public highway" intention was to prevent landowners from obstructing private, as well as public, highways.

While the complaint mentions the public interest, gravamen is that the road was closed "against the will of the plaintiff." The prayer was that Jones be restrained "from keeping said road closed and denying the use of it to the plaintiff."

Assuming general allegations that the road was unlawfully closed are sufficient to raise the question whether there was County Court consent, our opinion is that even though the statute be given the literal construction contended for by appellant, it affords no relief because the purpose, obviously, was to control roads in respect of which the public had a right through prescription, dedication, or otherwise. When Jones closed the gates in 1943, the public had no interest within the meaning of the Act.

Affirmed.